J-S22003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: I. O. T. K. A/K/A I. K. , A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T. W., FATHER | No. 3775 EDA 2017 |

Appeal from the Decree Entered October 18, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000725-2016
CP-51-DP-0000150-2016
FID# 51-FN-385658-2009

BEFORE: BENDER, P.J.E., STABILE, J., and PLATT,[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 1, 2018**

T.W. ("Father") appeals from the decree entered on October 18, 2017, that granted the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate Father's parental rights to I.O.T.K. a/k/a I.K. ("Child") and to change the goal to adoption.[1, 2] We affirm.

In its opinion, the trial court set forth a brief history of this case, as follows:

Child was born [i]n January [of] 2016. On January 19, 2016, [DHS] received a General Protective Services ("GPS") report alleging that [] Child and Child's [M]other [] tested positive

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] T.M.K. ("Mother") voluntarily relinquished her parental rights to Child in December of 2016.

[2] The transcript of the hearing held on October 18, 2017, notes that Carl Roberts, Esq., acted in the role of child advocate and that Jay Stillman, Esq., participated as the Guardian *Ad Litem* (GAL).

for cocaine at Child's birth. The report also alleged (1) that Mother had used cocaine throughout her pregnancy; (2) that Mother was homeless and unprepared to care for Child; (3) that Mother was diagnosed with depression, bi-polar disorder and anxiety and (4) that Father never visited Child at the hospital. On January 20, 2016, DHS obtained an Order for Protective Custody ("OPC") for Child and placed [] Child with a family friend. On January 27, 2016, DHS conducted a Parent Locater Search ("PLS") for Father but DHS was unable to verify any demographic information about Father based on insufficient information.

On February 3, 2016, Child was adjudicated dependent by the Honorable Judge Jonathan Irvine. On May 24, 2016, the Community Umbrella Agency ("CUA") issued a Single Case Plan ("SCP") for Father. [] Father's SCP objective was that he make himself available to DHS. Thereafter, Father's subsequent SCP objectives were (1) for Father to submit to drug screenings; (2) for Father to complete a Clinical Evaluation Unit ("CEU") assessment; (3) to have supervised visits with [] Child and (4) to sign medical consents for [] Child. On or about August 11, 2016, DHS filed the underlying Petition to Terminate Father's Parental Rights to Child alleging Father had failed to meet his SCP objectives. On October 18, 2017, following a full hearing[,] this [c]ourt ruled to terminate [] Father's parental rights to [] Child pursuant to 23 Pa.C.S.[] § 2511(a)(1)(2)(5) and (8) and found that termination of [] Father's rights was in the best interest of [] Child pursuant to 23 Pa.C.S.[] § 2511(b). Thereafter, Father filed a Notice of Appeal on November 15, 2017.

Trial Court Opinion (TCO), 1/2/18, at 2-3 (citations to record omitted).

Father, who was represented by counsel, attended the October 18, 2017 hearing. Testimony was provided by Brandi Moiyalloh, the CUA case manager, Patrick Smith, the visitation coach, and Father. In its opinion, the trial court set forth the following findings relating to the evidence presented:

At the termination hearing, the CUA Representative testified that [s]he personally informed [] Father of his SCP objectives, which were (1) for Father [to] submit to drug screenings; (2) [that] Father complete a CEU assessment; (3) that Father have supervised visits with [] Child and (4) that Father sign medical

- 2 -

consents for [] Child. The CUA Representative testified that Father did not complete the CEU assessment and that Father's refusal to complete the CEU assessment was in violation of prior [c]ourt orders. The CUA Representative testified that Father had not provided verification of a mental health assessment nor had Father allowed DHS to conduct a complete home assessment. As to the home assessment, the CUA Representative testified that Father only allowed the CUA Representative to inspect the basement, first floor, Father's bedroom and the upstairs bathroom of [] Father's house. The house was owned by [] Father's uncle and Father had roommates. The CUA Representative testified that [] Father did not allow the CUA Representative to inspect additional bedrooms. The CUA Representative testified that the house lacked smoke detectors and that the dining room had holes in the ceiling. Additionally, the bathroom sink did not drain properly. The CUA Representative further testified that the house was not appropriate for Child.

The CUA Representative testified that Child's primary bond was with Child's foster parent. The CUA Representative testified that [] Child's foster parent provided [] Child with love, safety and support and Child referred to the foster parent as mother. The CUA Representative testified that [s]he had witnessed multiple interactions between Child and the foster parent indicative of a child/parent bond. Interactions between Child and Father were also observed by the CUA Representative. Father had suffered a stroke in April 201[7], which greatly inhibited his ability to interact with Child. The CUA Representative testified that the termination of [] Father's parental rights would not cause irreparable harm to [] Child.

In addition to the CUA Representative, a visitation coach testified as to his observations of the interactions between Child and Father. The visitation coach testified that he had witnessed multiple interactions between [] Father and Child. The visitation coach testified that [] Child suffered separation anxiety when away from the foster parent and that [] Father had difficulty caring for [] Child due to his physical limitations. The visitation coach testified that Father could not easily change Child's diaper because he lacked the fine motor skills due to his [] stroke. The visitation coach testified that the child/parent bond between [] Child and foster parent was the "best" bond he had ever witnessed. The visitation coach also testified that the termination of Father's parental rights would not cause irreparable harm to [] Child.

*Id.* at 5-7 (citations to record omitted).

At the conclusion of the hearing, the court announced its decision from the bench, stating that it found that "the City has met its burden by clear and convincing evidence and [it] terminates the parental rights of [F]ather under 2511(a)(1) and (2), and 2511(b)." N.T., 10/18/17, at 60. The court also changed the goal for Child to adoption.

Father filed an appeal to this Court, setting forth the following two issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of Appellant, Father, under 23 Pa.C.S.[] § 2511 subsections (a)(1) and (a)(2)?

2. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S.[] § 2511(b), that termination of Appellant's parental rights best serves [] Child's developmental, physical and emotional needs and welfare?

Father's brief at 4.[3]

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the

---

[3] Father does not challenge the goal change.

record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

- 5 -

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Notably, the trial court here announced the basis for its order terminating Father's parental rights at the end of the hearing, citing only subsections (a)(1), (2) and (b). *See supra*. However, the decree and the opinion issued by the court listed subsections (a)(1), (2), (5), (8) and (b) as the basis for the issuance of the decree to terminate Father's parental rights. In his brief, Father only presents arguments related to subsection (a)(1), (2)

and (b). In light of this confusion, we decline to rely on either subsections (a)(5) or (8) as justification for the termination. Rather, because we need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), *see **In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004), we choose to address and analyze the court's decision to terminate Father's parental rights under section 2511(a)(1) and (b), which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \*\*\*
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In **In re Z.P.**, 994 A.2d 1108 (Pa. Super. 2010), this Court provided direction relating to what considerations need to be addressed when reviewing

a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the **Z.P.** Court stated:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. **In re C.S.**, [761 A.2d 1197 (Pa. Super. 2000)]. The court should consider the entire background of the case and not simply:
>
>> mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.
>
> **In re B.,N.M.,** 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005) (citing **In re D.J.S.**, 737 A.2d 283 (Pa. Super. 1999)).

**In re Z.P.**, 994 A.2d at 1117 (emphasis in original).

The thrust of Father's argument in regard to subsection (a)(1) centers on the testimony provided by Ms. Moiyalloh, the CUA case manager, Mr. Smith, the visitation coach, and his own testimony. Essentially, he attempts to identify reasons why he could not or did not need to comply with the case plan objectives. As an example, he acknowledges that he had not submitted for a drug assessment at CEU, because he had had drug screens performed at family court. Father also attempts to excuse his failure to submit to the drug assessment by explaining his missed appointments were due to his bad health and a lack of success in his ability to reschedule. He notes that he had not signed consents for Child, but that was because no consents were needed.

As for Father's housing, he admits "that he does not currently have appropriate housing, but is waiting for it and also is anticipating help from family members." Father's brief at 10. Father also acknowledges the visitation coach's testimony relating to "over 20 supervised visits[,]" which "did not go well because [] Child had separation anxiety from her foster parent" and Father's physical limitations. *Id.* Despite his recognition of the testimony presented by DHS's witnesses, Father claims that he is ready to perform all parental duties.

In response to Father's assertions, the brief submitted by the GAL points out that Father never "parented Child in his custodial care" and had no contact with her for more than a year-long period after she was found to be dependent. The GAL also noted Father's lack of appropriate housing, his physical inability to care for Child, and his failure to solicit family assistance. The GAL acknowledges Father's participation in some of the supervised visits with Child, but notes Father's failure to comply "with the court-ordered evaluations intended to assess his potential for reunification, or to plan and prepare for reunification[.]" GAL's brief at 16.

Thus, based upon its findings and credibility determinations, the court concluded that DHS had carried its burden of proving that Father refused or failed to perform his parental duties for a period of at least six months prior to the filing of the petition to terminate his parental rights. After our thorough

review, we determine that the record supports the trial court's findings and its conclusion; it did not abuse its discretion in so holding.

We next turn to Father's issue in which he claims that the termination of his parental rights would not best serve Child's developmental, physical and emotional needs and welfare pursuant to section 2511(b). In his brief following a recitation of the law, Father provides a short recitation of the facts on which he relies:

> The current [c]ase [m]anager, Ms. Moiyalloh, testified that [] Child has a loving bond with the foster parent. Mr. Patrick Smith, the current [v]isitation [c]oach for Father and Child, indicated that [] Child suffers from separation anxiety once she realizes that she is being taken from her foster parent for visits with [] Father.

> Mr. Smith testified that [] Child is becoming more comfortable around Father during visits. Father believes that the visits go well. Father indicated that [] Child is "fun and loving towards me" and during the visits, "she jumps on me and has a good time with me." Father indicated that he has a support system in place to help take care of his Child if the Child is returned. Father testified that he is ready to be reunified with [] Child.

Father's brief at 13-14 (citations to N.T. omitted). However, the court found that although Father loves Child, "there exist[s] a profound child/parent bond between [] Child and the foster parent." TCO at 7. Therefore, it concluded that termination of Father's parental rights would be in Child's best interests.

Again, our thorough review of the record reveals that the trial court did not abuse its discretion in ordering the termination of Father's parental rights. The record supports the court's findings and conclusion that Father's refusal

or failure to perform parental duties occurred for a period of at least six months prior to the filing of the petition. Moreover, the evidence shows that Child has bonded with foster parent, who more than satisfies her needs. Additionally, we note that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***In re Z.S.W.***, 946 A.2d 726, 732 (Pa. Super. 2008) (citation omitted). "[A] parent's basic constitutional right to the custody and rearing of [his or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d at 856. Since Father has not convinced us otherwise, we conclude that he is not entitled to any relief.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/1/18

- 11 -